# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 7:17-CR-145-LSC-HNJ** |
| | ) | |
| **RAYMON MARQUELL HARRIS** | ) | |

## EMERGENCY MOTION FOR SENTENCE REDUCTION
## PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

As this Court is aware, the country is in the middle of an unprecedented health crisis. Raymon Harris is among those most vulnerable to severe illness and death from COVID-19. According to an expert in infectious diseases at the University of Alabama at Birmingham, if Mr. Harris is infected, "he is highly likely to experience severe and potentially fatal COVID-19."[1] Mr. Harris suffers from several unique and distinct risk factors, including a latent tuberculosis infection and a past traumatic chest wound that left him with chronic pulmonary damage. These factors, which are relatively uncommon, saddle Mr. Harris with "unique susceptibility to severe illness or death" from COVID-19.[2] Mr. Harris is

---

[1] Declaration of Orlando Turner, M.D. ("Turner Decl."), Exhibit A, ¶ 21.

[2] *Id.* ¶ 20. At least six other federal courts, including courts in Texas and Nebraska, have released defendants with latent TB precisely because of the unique, elevated, and rapid risk of serious illness or death upon contraction of COVID-19. *See United States v. Ireland*, No. 17-20203, 2020 WL 4050245 (E.D. Mich. July

currently imprisoned at the FCC Yazoo City Prison Complex, where over 200 inmates and staff have tested positive for COVID-19 and at least four have died.

Mr. Harris, through undersigned counsel,[3] respectfully moves this Court to grant his motion for a reduction of his sentence and release from imprisonment pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). Specifically, Mr. Harris requests an order modifying his sentence to allow the remainder of his sentence to be served on supervised release under home confinement.

This Court should grant relief because of Mr. Harris's unique medical vulnerability and his unique susceptibility to contracting the fatal disease while housed in a crowded facility, which already has been overrun with COVID-19, and where he has limited ability to take necessary self-protective measures. Extraordinary and compelling reasons justify Mr. Harris's sentence reduction, and he therefore submits this emergency motion for relief.

---

20, 2020); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152 (E.D. Mich. Apr. 20, 2020): *United States v. Johnson*, No. H-96-176, 2020 WL 3618682 (S.D. Tex. July 2, 2020); *United States v. Watkins*, No. 15-20333, Dkt. No. 84 (E.D. Mich. July 16, 2020); *United States v. Parker*, No. 3:17-CR-18, 2020 WL 4432928 (D. Conn. July 31, 2020); *United States v. Barrenechea*, No. 92-CR-403, 2020 WL 2315638 (N.D. Cal. May 7, 2020); *United States v. Burke*, No. 4:17-CR-3089, 2020 WL 3000330 (D. Neb. June 4, 2020).

[3] Undersigned counsel represents Mr. Harris for purposes of this motion but does not represent him in his pending habeas litigation.

## I.  STATEMENT OF FACTS

### A. Mr. Harris's Conviction and Incarceration

On June 26, 2017, Raymon Harris pled guilty to a single count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  The factual basis for the plea agreement indicates that a police officer approached Mr. Harris while he was sitting as a passenger in a parked vehicle, asked him to step out of the car, and, when he complied, recovered a gun from underneath his seat.  No violent actions were alleged whatsoever.  The plea agreement goes on to stress that "Harris is not implicated in any shooting investigation."[4]

Counsel for the government acknowledged that Mr. Harris accepted responsibility for his actions, a fact that led it to recommend that the Court reduce Mr. Harris's offense level and sentence him at the "low end" of the range suggested by the U.S. Sentencing Guidelines, which provided for a range of 168 to 210 months.[5]  As counsel for Mr. Harris explained at sentencing, "There is no allegation he used [the firearm], no allegation that he threatened anyone with it. But he had it and he took responsibility for it."[6]  This Court found that Mr. Harris's sentence was subject to enhancement under the Armed Career Criminal Act

---

[4] Plea Agreement 3, Dkt. No. 15.
[5] Plea Agreement 4.
[6] Sentencing Tr. 11, Dkt. No. 35.

("ACCA"), however, based on three prior felony convictions, the most recent of which was seven years earlier.[7]  On March 29, 2018, Mr. Harris was sentenced to 210 months in prison.

Mr. Harris has since been serving his sentence at FCI Yazoo City Medium in Yazoo City, Mississippi.  He has served over 39 months of his sentence, during which time counsel finds he has accumulated no disciplinary reports connected to violence, weapons, drugs, or gangs.

## B. The COVID-19 Pandemic

COVID-19 is an unprecedented global pandemic and the United States currently is the epicenter.  As of this writing, the new strain of coronavirus which causes COVID-19 has infected over six million Americans and led to over 190,000 deaths in the United States alone.[8]  Nevertheless, the President recently delivered the sobering warning that the pandemic will "probably, unfortunately, get worse before it gets better."[9]

---

[7] This Court found that Mr. Harris was subject to the enhancement based on two 2004 convictions stemming from the same incident of unlawful distribution of a controlled substance, which were deemed "serious drug offenses," and a 2011 conviction for attempted first-degree assault, a "violent felony."  Sentencing Tr. 10.

[8] Johns Hopkins University, *COVID-19 Dashboard* (Sept. 13, 2020), https://coronavirus.jhu.edu/map.html.

[9] Toluse Olorunnipa, *Pandemic Likely to "Get Worse Before It Gets Better," Trump Says in Somber Return to Coronavirus Briefing*, Wash. Post, July 21, 2020, https://tinyurl.com/y2f6kd9f.

The impact of the pandemic is particularly harsh in the Sun Belt, where Mr. Harris is incarcerated. As Mississippi Governor Tate Reeves put it, "Mississippi is in a fight for our lives."[10] Indeed, as of this filing, there are 89,874 confirmed cases in Mississippi with at least 2,697 deaths.[11] "[W]e are in the middle of a spike," said Governor Reeves recently.[12] "This is the worst that it's ever been for spread of cases in our state."[13] Recent reporting reveals that the five largest medical centers in the state have no ICU bed space for new patients—coronavirus or otherwise—and are being forced to turn patients away, even as COVID-19 cases continue to surge.[14]

---

[10] Giacomo Bologna, *"Take This as an Alarm": Gov. Tate Reeves Orders Mask Mandate for 13 Mississippi Counties*, Miss. Clarion Ledger, July 9, 2020, https://tinyurl.com/y63pf5vr.

[11] The COVID Tracking Project, *Mississippi* (Sept. 13, 2020), https://covidtracking.com/data#state-ms.

[12] Bologna, *"Take This as an Alarm"*.

[13] Emily Wagster Pettus, *Governor: Mississippi Seeing its "Worst" Spread of COVID-19*, Associated Press (July 13, 2020), https://apnews.com/f7a7c7b1380a295b60c82ccd689dff54.

[14] Bologna, *"Take This as an Alarm"*; *see also* Scott Simmons, *COVID-19 Patients Fill 40% of Mississippi ICU Beds, Dobbs Says*, WAPT, July 20, 2020, https://www.wapt.com/article/covid-19-patients-fill-40-of-mississippi-icu-beds-dobbs-says/33371233 ("[W]e're really at the verge of pushing our system over its capacity. In large measure, we're already there.").

**C. Conditions at FCC Yazoo City**

The conditions at FCI Yazoo City Medium create an ideal environment for the transmission of contagious disease.[15] "Prisons are tinderboxes for infectious disease." *United States v. Rodriguez*, No. 03-CR-271, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020). According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," making "infection control challenging in these settings."[16] One recent study published in a medical journal found that the COVID-19 case rate among prisoners is approximately 450 percent higher than the U.S. population case rate.[17] To date, at least 118 prisoners in Bureau of Prisons ("BOP") custody have died from the disease.[18]

---

[15] Turner Decl. ¶¶ 12-16; *see also* Joseph Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047 (Oct. 2007), https://bit.ly/3cLcntD (noting that in jails and prisons "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

[16] Letter, *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://bit.ly/2W9V6oS.

[17] *See* Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons* (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

[18] Federal Bureau of Prisons, *COVID-19 Cases* (Sept. 7, 2020), https://www.bop.gov/coronavirus/#.

One of the federal prison facilities hit hardest by COVID-19 has been FCC Yazoo City.  By nearly any measure, the Yazoo City prison complex has one of the highest rates of prisoner infections in the BOP system.  As of September 7, 2020, the BOP website reports that 186 prisoners and 48 staff have been tested and confirmed to have contracted COVID-19 at FCC Yazoo City since testing began.[19] At least four prisoners at the complex have died.  The BOP reports that over 28 percent of tested prisoners have tested positive.[20]

At FCI Yazoo City Medium, it is impossible to practice "social distancing" or other protective practices recommended by the Centers for Disease Control and Prevention ("CDC").  Mr. Harris's dorm is under a 23 hour per day lockdown.  At all times, Mr. Harris is either confined to his cell, where he has no opportunity to distance himself from his cell-mate, or he is allowed out into the break room, where he cannot shower or communicate with loved ones on the phone without jeopardizing his health by getting close to other inmates lined up to do the same

---

[19] *Id.*

[20] *Id.*  This infection figure is almost certainly a drastic undercount due to the widespread practice of testing only those prisoners exhibiting known symptoms of COVID-19.  A recent CDC study of COVID-19 prevalence in 16 U.S. prisons and jails—including two BOP facilities—found that mass testing revealed a median 12.1-fold increase over the number of cases identified by earlier symptom-based testing alone.  Liesl Hagan, et al., *Mass Testing for SARS-CoV-2 in 16 Prisons and Jails — Six Jurisdictions, United States, April–May 2020*, 69 Morbidity & Mortality Weekly Report 1139 (Aug. 21, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6933a3.htm.

things.  Available cleaning materials are insufficient to maintain adequate

preventive hygiene, and the prison does not permit Mr. Harris to obtain hand

sanitizer.  Despite the lockdown, inmates in essential jobs cross between housing

units daily, including the inmate workers who enter Mr. Harris's dorm multiple

times each day to distribute food to everyone in the dorm.  Staff also move

between the different housing units, often coming into close contact with inmates.

The danger to Mr. Harris's health and life in FCC Yazoo City is severe and it

increases with each passing day.

### D. Mr. Harris's Latent Tuberculosis Infection, Traumatic Lung Injury, and Other COVID-19 Risk Factors

Mr. Harris suffers from multiple distinct medical conditions that render him

uniquely susceptible, even among the incarcerated population, to contracting

COVID-19 and experiencing serious illness or even death.  Dr. Orlando Turner, an

expert in infectious diseases, including COVID-19, at the University of Alabama at

Birmingham ("UAB"), examined Mr. Harris's BOP medical record and found

evidence of several vulnerabilities which "make him extremely high risk for a

severe outcome, including death, if he is exposed to SARS-CoV-2 and develops

COVID-19."[21]

---

[21] Turner Decl. ¶ 17.

First, the "most serious" risk factor for Mr. Harris is that he has latent tuberculosis ("TB") which was never adequately treated.[22]  During his time at FCC Yazoo City, Mr. Harris acquired TB through exposure to another inmate in "the same way one would contract SARS-CoV-2, through respiratory droplets or airborne transmission."[23]  BOP medical staff concluded that Mr. Harris's TB infection was "latent," meaning the bacteria are "resting in the lung tissues . . . waiting for the body's immune system to be compromised so they may 'reactivate', replicate, and cause active disease."[24]  After the BOP ruled out "active" TB in Mr. Harris, however, they stopped his TB treatment instead of treating him for latent TB in accordance with their own guidelines.[25]  "People with latent TB may develop active TB if they do not receive treatment."  *Atwi*, 2020 WL 1910152, at *5 (citing Centers for Disease Control and Prevention, *Treatment Regimens for Latent TB Infection (LTBI)*, available at https://bit.ly/2XUKHOX). Because Mr. Harris's latent TB was never adequately treated, he continues to have "viable TB bacteria in his lungs waiting to reactivate if given the opportunity."[26]

---

[22] *Id.* ¶ 20(b).

[23] *Id.*

[24] *Id.*

[25] *Id.* ¶¶ 20(b)-(c); Excerpted BOP Medical Record of Raymon Harris, Exhibit B, 1-9.

[26] Turner Decl. ¶ 20(d).

COVID-19 would provide that opportunity.  If Mr. Harris were to contract a COVID-19 infection, Dr. Turner opines that the stress it would place on his immune system would create an opportune and potentially disastrous time for Mr. Harris's latent TB bacteria to reactivate.  If the stress of COVID-19 on Mr. Harris's immune system were not enough to activate his TB, the standard treatment for COVID-19, corticosteroids, would weaken his body's immune system and further increase the likelihood of TB reactivation.  If his TB were to reactivate, Mr. Harris would experience a "superinfection"—two simultaneous infections of active TB and COVID-19—"setting the stage for a potentially fatal situation."[27]  Thus, even among the incarcerated population, Mr. Harris is uniquely susceptible to death secondary to contracting COVID-19.

Mr. Harris's second serious and unique COVID-19 comorbidity is a past traumatic wound to his chest that left him with chronic damage to his pulmonary system.  Dr. Turner notes that, [i]n 2007, "Mr. Harris suffered a stab wound to the left chest which led to a pneumothorax, commonly referred to as a collapsed lung, and chronic fibrosis (scarring) of the lung and surrounding pleural membrane (sac that surrounds the lung and decreases friction against the chest wall during expansion and contraction)."[28]  Dr. Turner also observes that, even if Mr. Harris's

---

[27] *Id.*
[28] *Id.* ¶ 20(a).

10

everyday lung function appears normal, "his pulmonary reserves, which are called into action when parts of his lung are damaged or filled with infectious fluids during episodes of pneumonia, are likely compromised,"[29] placing him at greater risk from COVID-19.

Mr. Harris's unique vulnerability to COVID-19 is elevated further by the fact that he is prediabetic and a long-term tobacco smoker, two conditions that are epidemiologically linked to more severe outcomes from diseases like COVID-19.[30] Prediabetes "has been repeatedly shown to be associated with severe COVID-19," and "smoking, or being a former smoker, is a well characterized risk factor for severe disease and one recognized by the CDC as commonly contributing to adverse COVID outcomes including death."[31]  Dr. Turner notes that, when coupled with the chronic risk factors outlined above, Mr. Harris's prediabetes and history of tobacco use "enhance his risk for serious illness or death from COVID-19."[32]

Mr. Harris's chronic conditions place him squarely within the group of people who are at uniquely high risk for life-threatening complications from COVID-19.  Given Mr. Harris's multiple distinct and serious chronic risk factors,

---

[29] *Id.* ¶ 21; Ex. B at 10-11 (radiologist notes indicating a "history of trauma to [the] left hemithorax," and a "pneumothorax present on the left side with loculated pleural effusion").
[30] Turner Decl. ¶¶ 19-21.
[31] *Id.* ¶ 19.
[32] *Id.*

if he contracts COVID-19, "he is highly likely to experience severe and potentially fatal" effects.[33]  The decision whether to release him is a matter of life or death.

### E. Mr. Harris's Application to the Bureau of Prisons

Mr. Harris has sought relief through the Bureau of Prisons' administrative process.  On April 6, 2020, Mr. Harris's wife, An'nie Harris, submitted a request to the warden of FCC Yazoo City on her husband's behalf, asking that Mr. Harris be released to home confinement.[34]  Ms. Harris's request noted that Mr. Harris's damaged lungs make him highly vulnerable to the virus and more likely to suffer serious harm.[35]  On April 14, 2020, Mr. Harris submitted an internal request to the BOP seeking compassionate release to home confinement due to his "punctured lung" and the dangers that he faces as a result of COVID-19.[36]

On April 20, 2020, Mr. Harris received a response from the BOP denying his request for "compassionate release."  The BOP denial stated that Mr. Harris's concerns about COVID-19 do not amount to "extraordinary or compelling reasons" for release.[37]

---

[33] *Id.* ¶ 21.
[34] Requests for Compassionate Release and BOP Response, Exhibit C, 1.
[35] *Id.*
[36] *Id.* at 2.
[37] *Id.* at 3.

## II.   LEGAL STANDARDS

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, a federal court is authorized to reduce a previously imposed term of imprisonment (or impose a term of supervised release that does not exceed the unserved portion of the original term of imprisonment) in two scenarios: (1) upon motion of the Director of the Bureau of Prisons or; (2) upon motion of the defendant, provided the defendant has exhausted the prison's administrative process or 30 days have elapsed since the prison warden received the defendant's request, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  Upon such a motion, a court may modify a defendant's sentence if, after considering the factors set forth in § 3553(a), it finds that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  *Id.*

The commentary accompanying the Sentencing Commission policy statement regarding compassionate release sets forth four circumstances constituting "extraordinary and compelling reasons."  U.S.S.G. § 1B1.13(1)(A) & cmt. n.1.  Among these are the "medical condition of the defendant," including where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected

13

to recover." § 1B1.13 cmt. n.1(A)(ii). The commentary to the policy statement also contains Application Note 1(D), a residual clause to provide relief for "other reasons," but purports to limit those other reasons "[a]s determined *by the Director of the Bureau of Prisons*." § 1B1.13 cmt. n.1(D) (emphasis added). Finally, the policy statement requires that the defendant not pose a danger to the safety of the community. § 1B1.13(2).

However, the Guidelines commentary that requires *the BOP* to determine "other reasons" for compassionate release is no longer "applicable" following passage of the First Step Act in 2018. The current Guidelines commentary was adopted a decade before the First Step Act on the premise that the BOP, not federal district courts, was the sole arbiter of when compassionate release is available. When it passed the First Step Act, Congress profoundly transformed the process for seeking and granting compassionate release by eliminating the requirement that a sentence reduction under § 3582(c)(1)(A) be "upon motion of the Director of Bureau of Prisons" and authorizing courts to act independently of the BOP Director. *See* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). In spite of this change, the Sentencing Commission's commentary "has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate

release." *United States v. McGraw*, No. 2:02-CR-18, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019).[38]

As a result, the Guidelines' outdated commentary is inconsistent with § 3582(c)(1)(A) as amended by the Act in two important respects.  First, the Commission's commentary still advises that "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.4.  Yet this instruction is clearly contradicted by the amended version of § 3582, which allows courts to grant sentence reductions even if the BOP Director never files a motion or opposes the defendant's motion.  *See* § 3582(c)(1)(A).

Second, the now-inapposite Guidelines commentary states that reasons beyond the three enumerated in Application Note 1 (A)-(C) may warrant a sentence reduction, but only if those reasons are "determined by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.1(D).  Yet, as noted, Congress reformed compassionate release to allow *courts* to grant a sentence reduction even in the face of an adverse BOP determination concerning whether a defendant's case is extraordinary or compelling.  And the purpose of the First Step Act's changes to compassionate release was to increase its use, a fact laid bare by the

---

[38] Nor could it.  The Sentencing Commission has been without a quorum since this enactment, leaving in place only the pre-Act Guidelines commentary.

title of the Act, "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239.[39] Thus, to accomplish its purpose of "increasing the use of compassionate release," Congress transformed § 3582 to put district courts in the position that the BOP Director formerly occupied. *See United States v. Rodriguez*, No. 17-CR-21, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) ("Congress knew that the BOP rarely granted compassionate release petitions, and the purpose of the FSA was to allow defendants to file motions in district courts directly even after the BOP Director denies their petition."). Continuing to condition release on a finding of "other reasons" by the BOP Director, rather than federal courts, therefore conflicts with the First Step Act's changes to compassionate release.

While a compassionate release sentence reduction must be consistent with the "applicable" policy statements of the Commission, those portions of the commentary superseded by statute are no longer "applicable." *See* 18 U.S.C. § 3553(a)(5) ("any pertinent policy statement" is to be considered "subject to any

---

[39] The BOP Director had historically failed to move for compassionate release even in cases in which the prisoner's circumstances met the Guidelines criteria for extraordinary and compelling reasons. *See e.g.*, U.S. DEP'T OF JUSTICE OFFICE OF THE INSPECTOR GEN., THE FEDERAL BUREAU OF PRISONS' COMPASSIONATE RELEASE PROGRAM i–iv (Apr. 2013) (concluding that the "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered").

amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission)").[40]

     "Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of the sentence-modification provisions under § 3852." *United States v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019). As a result, the Commission lacks an applicable policy statement regarding when a district court can grant compassionate release. *See United States v. Brown*, No. 4:05-CR-227-1, – F.Supp.3d –, 2020 WL 2091802, at *5 (S.D. Iowa Apr. 29, 2020) (collecting cases).

     In the absence of an applicable policy statement, a growing number of courts have concluded that "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief." *Cantu*, 423 F. Supp. 3d at 352; *see also United States*

---

[40] It is well-established that Congress may implicitly override the Commission's policy statements by statute. *See Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) (Congress may "revoke or amend" any of the Commission's policy statements by statute at any time); *United States v. Colon*, 707 F.3d 1255, 1261 (11th Cir. 2013) (same).

*v. Fox*, No. 2:14-CR-3, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts"); *Brown*, 2020 WL 2091802, at *7 ("[I]f the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it").  The Guidelines commentary, in the words of one court in this circuit to consider the issue, "provides helpful guidance but does not constrain the issues a court may consider in assessing whether a defendant's application for compassionate release provides 'extraordinary and compelling reasons' for a sentence reduction under § 3582(c)(1)."  *United States v. Ullings*, No. 1:10-CR-406, 2020 WL 2394096, at *2 (N.D. Ga. May 12, 2020); *see also United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (same).

The result is that a district court can consider anything the BOP could have considered when assessing a defendant's motion, even in the face of the BOP Director's views that a defendant's circumstances are not extraordinary or compelling.  "[T]he majority of district courts to consider the question have found that the amendments made to 18 U.S.C. § 3582(c)(1)(A) grant this Court the same discretion as that previously given to the BOP Director."  *United States v. Lisi*, No.

15-CR-457, – F.Supp.3d –, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020),

reconsideration denied, No. 15-CR-457, 2020 WL 1331955 (S.D.N.Y. Mar. 23,

2020); *see also, e.g.*, *Beck*, 2019 WL 2716505, at *6 (noting that the First Step Act

"explicitly allows courts to grant such motions even when BOP finds they are not

appropriate"); *United States v. Kowalewski*, No. 2:13-CR-45-RWS (N.D. Ga. Apr.

30, 2020), Dkt. No. 251, at 12 ("The Court thus finds that it is authorized to

consider the enumerated circumstances, as well as circumstances other than, or in

combination with, the enumerated circumstances."); *Ullings*, 2020 WL 2394096, at

*2 (same); *United States v. Redd*, No. 1:97-CR-6, 2020 WL 1248493, at *8 (E.D.

Va. Mar. 16, 2020) ("[T]he Court joins other courts concluding that a court may

find, independent of any motion, determination or recommendation by the BOP

Director, that extraordinary and compelling reasons exist based on facts and

circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C).").

In considering Mr. Harris's application, therefore, this Court is not limited

by the factors expressly contained in Note 1(A)-(C) in considering whether Mr.

Harris's individual situation and circumstances present "extraordinary and

compelling" circumstances for a sentence reduction.

## III.   ARGUMENT

This Court should grant Mr. Harris's motion and immediately reduce his

sentence so that he can be released from prison into home confinement under

supervised release.  As a threshold matter, Mr. Harris has exhausted his

administrative remedies as required by § 3582(c) and his motion to this Court is

timely.  Mr. Harris's unique vulnerability to COVID-19 inside a prison

environment where he is likely to become infected presents an extraordinary and

compelling reason warranting a reduced sentence.  Mr. Harris's sentence reduction

and release to home confinement would not pose a danger to the community, and a

balancing of the 18 U.S.C. § 3553(a) factors with the risks COVID-19 poses to Mr.

Harris's life weighs in favor of release.

### A. Mr. Harris's Motion is Timely

Mr. Harris has satisfied § 3582(c)(1)(A) and his motion is timely.  Mr.

Harris and his wife each submitted reduction in sentence and compassionate

release requests to the warden of his facility, with the warden denying the request

on April 20, 2020.[41]  Therefore, Mr. Harris's administrative remedies have been

exhausted and more than 30 days have elapsed since the initial request.  §

3582(c)(1)(A) (requiring a defendant to exhaust administrative remedies or wait 30

days after serving his petition on the warden of his facility before filing a motion in

---

[41] Ex. C at 1-3.

court, whichever is earlier).  Section 3582(c)(1)(A) provides the Court with

authority to consider Mr. Harris's motion.

### B. Mr. Harris's Vulnerability to COVID-19 Presents an "Extraordinary and Compelling" Reason Warranting a Reduced Sentence

Due to his medical conditions, Mr. Harris has a "unique susceptibility to

severe illness or death secondary to COVID-19."[42]  Numerous courts across the

country have found that, against the backdrop of conditions of confinement which

make infection more likely, such susceptibility constitutes "extraordinary and

compelling reasons" for reducing a sentence.  As explained below, Mr. Harris's

high likelihood of contracting and "experiencing severe and potentially fatal

COVID-19"[43] constitute textbook "extraordinary and compelling reasons" under

either Application Note 1(A) or, now that the First Step Act has given this Court

the discretion to determine what constitutes "extraordinary and compelling

reasons," under Note 1(D).  Thus, Mr. Harris presents "extraordinary and

compelling reasons" for his sentence reduction.

#### i. "Extraordinary and Compelling Reasons" Exist Due to the Unique Risk that COVID-19 Poses to Mr. Harris

First, this court should exercise its discretion following the passage of the

First Step Act to find that Mr. Harris's heightened vulnerability to COVID-19 and

---

[42] Turner Decl. ¶ 20.

[43] *Id.*

21

the likelihood he will be infected if he remains in his current location together present "extraordinary and compelling reasons" for a sentence reduction under Application Note 1(D).  U.S.S.G. § 1B1.13 cmt. n.1(D).

Because of his unique health issues, Mr. Harris faces a heightened risk of life-threatening consequences if he contracts this disease.  As stated in the attached declaration of Dr. Orlando Turner, an infectious disease expert at UAB, Mr. Harris suffers from several serious and unique chronic conditions that make him susceptible to "severe" and "potentially fatal" effects from COVID-19.[44]  Courts across the country have found "extraordinary and compelling" reasons warrant a reduction in a petitioner's sentence in circumstances resembling Mr. Harris's.

First, Mr. Harris has latent TB in his lungs which could reactivate from infection with COVID-19 or from the treatment thereof, "setting the stage for a potentially fatal situation."[45]  Numerous courts have recognized that "individuals with latent or active TB may be more susceptible to SARS-CoV-2 infection" and that "COVID-19 disease progression may be more rapid and severe" in those with latent or active tuberculosis.  *Doe v. Barr*, No. 20-CV-02141, 2020 WL 1820667, at *5 (N.D. Cal. Apr. 12, 2020) (citation omitted); *see also Ireland*, 2020 WL 4050245 (ordering compassionate release of defendant with latent tuberculosis);

---

[44] Turner Decl. ¶ 21.

[45] *Id.* ¶ 20(d).

*Atwi*, 2020 WL 1910152 (same); *Johnson*, 2020 WL 3618682 (same); *Watkins*, No. 15-20333 (same); *Parker*, 2020 WL 4432928 (same); *Barrenechea*, 2020 WL 2315638 (same); *Burke*, 2020 WL 3000330 (same).

Moreover, medical scans reveal that Mr. Harris has chronic pulmonary damage from a traumatic injury which left him with a punctured lung and lasting limitations on his lung capacity.[46]  Like TB, these pulmonary issues are also widely recognized by district courts to multiply one's level of vulnerability to COVID-19. *See, e.g.*, *United States v. Mahoney*, No. 10-CR-951, 2020 WL 4430571 (N.D. Ill. July 31, 2020) (ordering release of defendant who has lung damage resulting from a collapsed lung in 2007 and subsequent surgery); *United States v. Kidd*, No. 19-CR-27, 2020 WL 3270850, at *1 (E.D. Wis. June 17, 2020) (ordering release of defendant with "lungs [that] were physically damaged when he was shot in the chest as a young man"); *United States v. Joseph*, No. 18-CR-350, 2020 WL 2315806, at *1 (N.D. Cal. May 8, 2020) (ordering release of defendant suffering from "lung scarring").  Finally, Mr. Harris's risk level is further elevated by his

---

[46] *Id.* ¶ 20(a) ("[Mr. Harris's] pulmonary reserves, which are called into action when parts of his lung are damaged or filled with infectious fluids during episodes of pneumonia, are likely compromised.  As a result, any injury or impairment would be significantly more difficult for Mr. Harris to overcome as compared with an individual with healthy lungs and has a greater potential to leave Mr. Harris with lasting morbidity.").

history of tobacco use and prediabetes.[47]  In sum, Mr. Harris's risk factors saddle him with "unique susceptibility to severe illness or death secondary to COVID-19."[48]

While courts have not waited for an outbreak to take decisive action,[49] FCC Yazoo City is currently the site of an alarming outbreak of COVID-19.  *See United States v. Hayden*, No. 1:07-CR-68, 2020 WL 4218503 (N.D. Ind. July 23, 2020) (ordering release of 38-year old defendant with chronic kidney disease from Yazoo City Medium); *United States v. Smith*, No. 15-CR-30039, 2020 WL 3027197 (C.D. Ill. June 5, 2020) (ordering release of 37-year-old defendant with sleep apnea,

---

[47] Turner Decl. ¶¶ 18-19.

[48] *Id.* ¶ 20.

[49] Numerous courts have granted compassionate release to medically vulnerable individuals despite there being no confirmed cases at the facility.  *See, e.g.*, *United States v. Feucht*, No. 11-CR-60025, Dkt. No. 53 (S.D. Fla. May 28, 2020) (granting release despite no confirmed cases because "[z]ero confirmed cases is not the same thing as zero COVID-19 cases" (citation omitted)); *United States v. Atkinson*, No. 2:19-CR-55, 2020 WL 1904585, at *4 (D. Nev. Apr. 17, 2020) (granting release despite no confirmed cases because, "even in the best run prisons," the realities of prison life make CDC guidelines "difficult if not impossible to follow" for medically vulnerable defendants (citation omitted)); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (granting release despite no reported cases because defendant could not adequately protect himself in line with CDC guidelines); *United States v. Asaro*, No. 17-CR-127, 2020 WL 1899221, *3 (E.D.N.Y. Apr. 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Moore*, No. 3:16-CR-171, 2020 WL 2572529, *2 (D. Ore. May 21, 2020) ("While there have been no identified cases of COVID-19 at FCI Sheridan as of the date of this opinion, infection can spread with deadly speed.").

hypertension, and obesity from Yazoo City Low).  Over 200 prisoners and staff

have tested positive, and the spiking numbers of cases and hospitalizations in

surrounding Mississippi suggest those numbers will continue to increase.[50]  With

such a large outbreak at FCC Yazoo City, coupled with Mr. Harris's medical

conditions and inability to protect himself inside the prison, the question is not *if*

Mr. Harris will be infected, but *when*.  For his own safety, Mr. Harris needs to be

removed from FCC Yazoo City immediately.

To be clear, Mr. Harris does not assert that the elevated risk of exposure to

COVID-19 alone creates "extraordinary and compelling" reasons for release.

Rather, a reduction in his sentence is warranted due to the combination of his

unique risk factors, which—whether considered independently or cumulatively—

place him at acutely higher risk of severe illness and death if he were to get

infected with COVID-19, and his conditions of confinement, which, despite his

best efforts to protect himself, place Mr. Harris at unbearably high risk of

infection.[51]

---

[50] Federal Bureau of Prisons, *COVID-19 Cases*.

[51] In other cases, the Government has agreed that such a combination constitutes "extraordinary and compelling reasons" for a sentence reduction.  *See, e.g.*, *Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020) ("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers from the chronic conditions associated with severe illness from COVID-19 are eligible for compassionate release."); *United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) ("The

Indeed, many other courts in this District and this Circuit have held that compassionate release is justified under conditions that are arguably less potentially lethal than those facing Mr. Harris.  *See, e.g.*, *United States v. Knox*, No. 2:16-CR-116, 2020 WL 3207799, at *2 (N.D. Ala. June 15, 2020) (granting motion for defendant with Parkinson's disease and hypertension); *United States v. Goree*, 2:17-CR-36-MHH-GMB, Dkt. No. 41 (N.D. Ala. July 20, 2020) (hypertension, obesity); *United States v. Tolbert*, 2:17-CR-349-MHH-HNJ, Dkt. No. 52 (N.D. Ala. July 20, 2020) (no reason stated); *United States v. Hester*, 4:03-CR-535-KOB-GMB, Dkt. No. 175 (N.D. Ala. July 27, 2020) (diabetes, hypertension); *United States v. Oates*, 3:18-CR-283-KOB-SGC, Dkt. No. 40 (N.D. Ala. July 30, 2020) (diabetes, hypertension, obesity); *United States v. Brown*, 2:18-CR-360-KOB-JEO, Dkt. No. 35 (N.D. Ala. May 22, 2020) (COVID-positive petitioner with asthma); *Unites States v. Greenhaw*, 5:18-CR-102-MHH-GMB, Dkt. No. 87 (N.D. Ala. June 22, 2020 (diabetes, hypertension, COPD, sleep apnea); *United States v. McCall*, No. 2:18-CR-95, Dkt. No. 96 (M.D. Ala. June 4, 2020) (COVID-positive with sickle cell disease); *United States v. Dunn*, No. 3:12-CR-177, 2020 WL 4366086 (M.D. Ala. July 30, 2020) (hypertension, COPD,

---

Government now agrees, based on recent Department of Justice guidance, that Wright's diabetes condition, and perhaps other medical conditions she presently has, could constitute 'extraordinary and compelling reasons' under the circumstances of the COVID-19 pandemic.").

emphysema); *United States v. Lynn*, No. 89-CR-72, 2020 WL 3229302 (S.D. Ala. June 15, 2020) (advanced age, high cholesterol, sleep apnea); *Ullings*, 2020 WL 2394096 (advanced age, hypertension, obesity).

In short, the critical situation at FCC Yazoo City, combined with Mr. Harris's unique susceptibility to severe outcomes from COVID-19, constitute extraordinary and compelling reasons that justify his sentence reduction under Application Note 1(D).

### ii. "Extraordinary and Compelling Reasons" Exist Because Mr. Harris is Unable to Provide Self-Care Against COVID-19

Even if this Court finds it is limited to considering the enumerated circumstances in U.S.S.G. § 1B1.13(A)-(C), it should grant Mr. Harris's request. Based on many of the same facts discussed above, Mr. Harris's chronic COVID-19 risk factors amount to a "serious physical . . . condition" which, given the threat COVID-19 poses to him in his current setting, "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." U.S.S.G. 1B1.13, cmt. n.1(A)(ii). Therefore, extraordinary and compelling reasons exist for this Court to grant Mr. Harris's sentence reduction.

Mr. Harris's latent tuberculosis in his lungs, chronic lung damage, and other risk factors are undoubtedly serious medical conditions during a global pandemic

that is most fatal to people with lung and heart conditions.[52]  The CDC warns that chronic airway and lung diseases can cause more severe COVID-19 infection because of pre-existing scarring, inflammation, or lung damage.[53]

The CDC expressly recommends that people with pre-existing vulnerabilities like Mr. Harris's should take extra precautions to protect themselves from infection.[54]  The CDC urges everyone to protect themselves by washing their hands often, maintaining at least six feet of distance from other people, wearing a mask any time they are around others, and routinely cleaning and disinfecting frequently touched surfaces, but it notes that these safety precautions are "especially important for people at increased risk of severe illness," such as Mr. Harris.[55]

Under current conditions, Mr. Harris has little ability to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from

---

[52] Turner Decl. ¶ 21 ("If infected, [Mr. Harris] is highly likely to experience severe and potentially fatal COVID-19.").

[53] *See* Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (July 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (including "having damaged or scarred lung tissues" in a list of "underlying medical conditions" that put an individual "at increased risk for severe illness from COVID-19," regardless of age).

[54] *Id.*

[55] *Id.*

contracting the disease and becoming severely ill.[56]  Mr. Harris cannot avoid

contact with infected areas or people, and he cannot take basic steps to ward off the

disease.  He has no ability to self-isolate, minimal access to protective gear, and

inadequate sanitation and hygiene supplies.  *See United States v. Ramos*, No. 18-

CR-30009, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) ("[I]t is not possible

for a medically vulnerable inmate . . . to isolate himself in [an] institutional setting

as recommended by the CDC[.]").  Indeed, given his vulnerabilities, Mr. Harris's

inability to protect himself is an inability to provide self-care.  *See Atkinson*, 2020

WL 1904585, at *3 ("The presence of COVID-19 . . . necessitates a more

expansive interpretation of what self-care means"); *United States v. Muniz*, 4:09-

CR-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (same); *see also* Gov't's Resp. in

Opp'n to Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. §

3582(c)(1)(A)(i), *United States v. Hird*, No. 2:13-CR-39, Dkt. No. 650, at 14 (E.D.

Pa. May 19, 2020) (conceding that "the risk of COVID-19" to a vulnerable inmate

"presents 'a serious physical or medical condition . . . that substantially diminishes

the ability of the defendant to provide self-care within the environment of a

correctional facility,' as stated in note 1(A)").

---

[56] Turner Decl. ¶¶ 12-16.

Thus, whether considered separately or together, Mr. Harris's medical conditions are serious and "'substantially diminish[] [his] ability 'to provide self-care'—remaining free of the most severe COVID-19 symptoms—'within the environment of a correctional facility.'" *Johnson*, 2020 WL 3618682, at *3 (citing U.S.S.G. 1B1.13, cmt. n.1(A) to order release of defendant with latent tuberculosis); *Mahoney*, 2020 WL 4430571, at *2 (citing U.S.S.G. 1B1.13, cmt. n.1(A) to order release of defendant with lung scarring).

In summary, Mr. Harris's circumstances are consistent with the Sentencing Commission's guidance and fit comfortably within the "serious physical . . . condition" circumstance contemplated by Application Note 1(A).  COVID-19 poses a threat of severe illness or death to Mr. Harris due to his chronic physical ailments.  Moreover, the conditions of confinement at FCC Yazoo City create an optimal environment for the transmission of contagious disease and do not allow Mr. Harris to take the necessary self-care measures called for by the CDC to protect his health and safety.  For this reason, the Court should find that "extraordinary and compelling" reasons exist to reduce Mr. Harris's sentence.

## C. The Remaining Criteria Weigh Strongly in Favor of Reducing Mr. Harris's Sentence and Converting it to Home Confinement Under Supervised Release

The Court must also consider whether the defendant poses "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §

3142(g)," as well as the relevant sentencing factors in § 3553(a) to determine whether a sentencing reduction is warranted.  18 U.S.C. § 3582(c)(1)(A)(i).  In this case, a review of the § 3553(a) factors and Mr. Harris's release plan of home confinement under electronic monitoring for the remainder of his unserved original term of imprisonment favors granting his sentence reduction.

The statutory factors outlined in § 3553(a) include, among others: the defendant's history and characteristics, the need to provide him with any required medical treatment in the most effective manner, the need to provide restitution to any victims of the offense, the need for the sentence to reflect the seriousness of the defendant's crimes, the need to avoid unwarranted disparities in sentences between similarly situated individuals, and the related needs to provide adequate deterrence to criminal conduct and to promote respect for the law.  18 U.S.C. § 3553(a).

In considering these factors, the district court is not tasked with revisiting the sentencing court's original determination of the factors.  Rather, the Court is asked to weigh those factors alongside the "extraordinary and compelling reasons" warranting compassionate release.  *United States v Ebbers*, No. S402-CR-11443VEC, 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020).  For the reasons outlined below, given his increased vulnerability, releasing Mr. Harris to home

confinement is fully consistent with the § 3553(a) sentencing factors and will in no way undermine the goals of this Court's original sentence.

First, Mr. Harris's offense conduct, while serious, did not involve an act of violence. Mr. Harris's crime did not involve any threat or use of force. There was no allegation that he used the weapon in any way or was suspected of having done so. In addition, as the government has acknowledged, Mr. Harris took responsibility for his possession of a prohibited weapon. Considering the current pandemic, the calculus justifying the appropriate sentence for this conduct has changed.

Indeed, although Mr. Harris's conduct did not include an act of violence, other courts have not hesitated to grant compassionate release in the cases of individuals who *are* serving sentences for crimes of violence. *See, e.g.*, *Brown*, 2:18-CR-360-KOB-JEO (granting compassionate release of defendant convicted of use of a firearm in connection with drug trafficking); *United States v. Williams*, No. 3:04-CR-95, Dkt. No. 91 (N.D. Fla. Apr. 1, 2020) (granting compassionate release of defendant convicted of armed bank robbery and brandishing a firearm during a crime of violence who had a prior criminal history including "six prior convictions for armed bank robbery and three prior convictions for bank robbery"); *United States v. Peterson*, No. 7:12-CR-15, Dkt. No. 63 (E.D.N.C. June 4, 2019)

(granting compassionate release of defendant whose offenses included discharging a firearm in the furtherance of a drug trafficking offense).

Second, Mr. Harris is a rehabilitated offender. While incarcerated, he has not incurred any disciplinary infractions connected to violence, weapons, drugs, or gangs.[57] He has been a productive member of the prison population, participating in programming, signing up for the prison's GED program, and joining a work detail. Thus, neither specific deterrence nor rehabilitation are further served by keeping Mr. Harris in prison. Nor is restitution an issue as there were no victims from Mr. Harris's crime.

We propose that as part of Mr. Harris's continued punishment in this case the Court convert the remaining years of his expected term of imprisonment to home detention as a condition of supervised release. The recently amended compassionate release statute specifically authorizes the Court to extend supervised release in this way. *See* 18 U.S.C. § 3582(c)(1)(A) (the court "may

---

[57] In over three years of incarceration, Counsel's investigation reveals that Mr. Harris has received only two disciplinary infractions. The first, for "refusing to obey an order," occurred during Mr. Harris's first week at FCC Yazoo City, when, unaware of the facility's rules, he was written up along with around 15 other inmates for not returning to their cells before the count began. The second, for "disruptive conduct," was the result of a cell phone SIM card discovered in the cell that Mr. Harris shared with another man. There was no allegation that the SIM card had been used in any criminal enterprise. Neither of these infractions resulted in an increase in Mr. Harris's security classification.

33

impose a term of probation or supervised release with or without conditions that

does not exceed the unserved portion of the original term of imprisonment"));

*Goree*¸ No. 2:17-CR-36-MHH-GMB (granting motion for reduction in sentence

and imposing an additional term of supervised release); *Hester*, 4:03-CR-535-

KOB-GMB (same); *Oates*, 3:18-CR-283-KOB-SGC (same).  Conditions of home

detention can provide a "sufficient but not greater than necessary" sanction of

punishment and mitigate any risk this Court deems Mr. Harris to present to the

community.  18 U.S.C. § 3553(a).  Mr. Harris's term of imprisonment, coupled

with home confinement, would meet § 3553(a)'s purpose to give due respect for

the law and to acknowledge the seriousness of the offense.[58]  In this way, Mr.

---

[58] Courts across the country, including others in this district, have granted compassionate release even where a petitioner has served less than the majority of their sentence.  *See, e.g.*, *United States v. Brown*, 2:18-CR-360-KOB-JEO, Dkt. No. 35 (N.D. Ala. May 22, 2020) (reducing 60-month sentence to 11 months' time served); *United States v. Somerville*, No. 2:12-CR-225-NR, 2020 WL 2781585 (W.D. Pa. May 29, 2020) (reducing 15-year ACCA mandatory sentence to approximately 8 years); *Loyd v. United States*, No. CR 15-20394-1, 2020 WL 2572275 (E.D. Mich. May 21, 2020) (reducing 10-year mandatory minimum sentence for drug trafficking to 3 years); *United States v. Barber*, No. 6:18-CR-446, 2020 WL 2404679 (D. Or. May 12, 2020) (reducing 60-month mandatory minimum sentence to 8.5 months); *United States v. Delgado*, No. 3:18-CR-17, 2020 WL 2464685, at *1, *4 (D. Conn. Apr. 30, 2020) (reducing 120-month sentence to 29 months); *United States v. Kelley*, No. 16-CR-38, 2020 WL 2850280, (N.D. Cal. June 2, 2020) (reducing 120-month sentence to 49 months); *United States v. Winston*, Crim. No. 1:13-CR-639, Dkt. No. 295 (D. Md. Apr. 28, 2020) (reducing 120-month sentence to 36 months).

Harris would continue to face confinement as punishment, but without the attendant serious risk to his physical health.

Any risk Mr. Harris is deemed to present to the community can be capably mitigated by home confinement.  Significantly, courts have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate public safety concerns.  *See, e.g.*, *United States v. Williams*, No. 04-95, Dkt. No. 91 (N.D. Fla. Apr. 1, 2020) (finding that the risk of defendant engaging in further criminal conduct can be managed through home confinement and the terms of his supervised release); *United States v. Heyward*, No. 17-CR-527, 2020 WL 3547018, at *3 (D. Md. June 30, 2020) ("I will impose conditions of release that further mitigate the risk of recidivism. . . .  Under these conditions, his release does not pose a danger to the community."); *United States v. Jackson*, No. 4:14-CR-576, 2020 WL 1955402 (S.D. Tex. Apr. 23, 2020) (finding that any lingering concerns can be addressed through tailored conditions of release, including placing defendant on home confinement).  With appropriate supervision, Mr. Harris will not be "a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

Further minimizing the risk associated with granting this motion is the strong support that Mr. Harris enjoys outside prison.  Mr. Harris is in a stable, committed marriage, and he is a loving stepfather to his wife's two young daughters, aged 12 and 15.  Mr. Harris enjoys great family support at home in Tuscaloosa, where his wife, stepchildren, mother, stepfather, and multiple siblings all reside.  The family unit, despite Mr. Harris's incarceration, remains exceptionally close.  If he is released, Mr. Harris will return to a stable residence which includes appropriate living arrangements to allow for his quarantine, employment opportunities, and the ability to thrive under a home confinement condition of supervised release.

Mr. Harris's medical conditions have left him hopeless to protect himself and prey to infectious disease.  But this Court did not sentence him to die in prison.  Considering the statutory factors and the unique and extraordinary life and death circumstances Mr. Harris faces in prison, the Court should grant Mr. Harris compassionate release.

## CONCLUSION

For the foregoing reasons, Mr. Harris respectfully requests that the Court grant a reduction in his sentence to time served with an extended period of supervised release to cover the unserved portion of his prison term, with a condition of home confinement.

Respectfully submitted,

/s/ *Mark Loudon-Brown*
Mark Loudon-Brown
SOUTHERN CENTER FOR
    HUMAN RIGHTS
60 Walton Street NW
Atlanta, GA 30303
Phone: 404-688-1202
Fax: 404-688-9440
Email: mloudonbrown@schr.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2020**,** I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record, and mailed a courtesy copy by certified mail to the Court's chambers at United States District Court, Federal Building and United States Courthouse, 2005 University Boulevard, Tuscaloosa, AL 35401.

/s/ <u>*Mark Loudon-Brown*</u>
Mark Loudon-Brown
SOUTHERN CENTER FOR
  HUMAN RIGHTS
60 Walton Street NW
Atlanta, GA 30303
Phone: 404-688-1202
Fax: 404-688-9440
Email: mloudonbrown@schr.org
